The **JOINT STOCK SOCIETY "TRADE HOUSE OF DESCENDANTS OF PETER SMIRNOFF, OFFICIAL PURVEYOR TO THE IMPERIAL COURT"** and **The Russian American Spirits Company, Plaintiffs,**

v.

**HEUBLEIN, INC. and International Distillers & Vintners Ltd., Defendants.**

**HEUBLEIN, INC., Third–Party Plaintiff,**

v.

**William N. WALKER and Jerome S. Mann, Third–Party Defendants.**

Civil Action No. 95–749–RRM.

United States District Court,
D. Delaware.

Aug. 2, 1996.

Josy W. Ingersoll, James P. Hughes and John P. Shaw, Young, Conaway, Stargatt & Taylor, Wilmington, DE; Maxim H. Waldbaum, Claudia Cantarella, and Zuan–Thao Nguyen, Fried, Frank, Harris, Shriver & Jacobsen, New York City, for plaintiffs.

Allan M. Terrell, Francis DiGiovanni and Jeffrey L. Moyer, Richards, Layton & Finger, Wilmington, DE; Stephen R. Lang, Paul Dennis Connuck, Patricia Anne Kuhn, and Adina O. Broder, Whitman, Breed, Abbott & Morgan, New York City, for defendants.

## OPINION

McKELVIE, District Judge.

This is a trademark and unfair competition case. Plaintiff The Joint Stock Society "Trade House of Descendants of Peter Smirnoff, Official Purveyor to the Imperial Court" (the "Society") is a Russian corporate entity with its principal place of business in Moscow. Plaintiff The Russian American Spirits Company ("RASCO") is a Delaware corporation with its principal place of business in Connecticut. Defendant Heublein, Inc. ("Heublein") is a Connecticut corporation with its principal place of business in Connecticut. Defendant International Distillers & Vintners Ltd. ("IDV") is a United Kingdom limited liability corporation with its principal place of business in London, England. Third-party defendant William N. Walker is the president of RASCO. Third-party defendant Jerome S. Mann is a liquor industry consultant to RASCO.

On December 8, 1995, plaintiffs filed a complaint alleging that defendants' use of the trademark and trade name Smirnoff®, compositions and derivatives thereof, and the Smirnoff family crest, insignia, emblems, and medals, constitute false designation of origin and false advertising in violation of § 43(a)(1)

182

of the Lanham Act, 15 U.S.C. § 1125(a)(1). Plaintiffs also claim that defendants fraudulently secured the registration of these trademarks and trade names in the United States Patent and Trademark Office in violation of § 38(b) of the Lanham Act, 15 U.S.C. § 1120. Plaintiffs seek to cancel defendants' registered trademarks and trade names based on the above alleged violations pursuant to §§ 14 and 37 of the Lanham Act, 15 U.S.C. §§ 1064 and 1119, and they seek injunctive relief pursuant to § 34 of the Lanham Act, 15 U.S.C. § 1116. Finally, plaintiffs allege that defendants' actions constitute deceptive acts and practices and unfair competition in violation of the Delaware Uniform Deceptive Trade Practices Act, 6 *Del.C.* §§ 2531–36 *et seq.* (the "Deceptive Trade Practices Act"). On December 15, 1996, plaintiffs filed an amended complaint containing the same allegations.

On January 19, 1996, defendants filed their answer, counterclaims, and Heublein's third-party complaint against third-party defendants Walker and Mann. Defendants also filed a motion to transfer this case to the United States District Court for the District of Connecticut pursuant to 28 U.S.C. § 1404(a). In their counterclaims and in Heublein's third-party complaint, defendants claim that plaintiffs and third-party defendants have made false and deceptive claims about Heublein's advertising and use of the Smirnoff® labels, symbols, and marks in violation of § 43 of the Lanham Act. In addition, defendants allege that plaintiffs and third-party defendants have tortiously interfered with Heublein's business and economic relations. Finally, defendants assert that these acts of plaintiffs and third-party defendants constitute unfair and deceptive acts and trade practices, false advertising, unfair competition, trade libel, and slander of title in violation of the Deceptive Trade Practices Act and Delaware common law.

On February 1, 1996, defendants filed their first amended answer, counterclaims, and third-party complaint. On March 5, 1996, plaintiffs filed an answer to defendants' counterclaims. On that same date, third-party defendants Walker and Mann filed a motion to dismiss for lack of personal jurisdiction

pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure ("FRCP"), insufficient service of process pursuant to FRCP 12(b)(5), and failure to state a claim pursuant to FRCP 12(b)(6). On July 23, 1996, defendants filed their second amended answer, counterclaims, and third-party complaint.

This is the court's decision on defendants' motion to transfer and third-party defendants' motion to dismiss.

## I. FACTUAL BACKGROUND

The parties have fully briefed the issues before the court. Defendants have submitted the affidavit of Paul F. Curtis and the declaration of Frederick J. Ledrew in support of their motion to transfer. Defendants have also submitted the affidavit of Paul Dennis Connuck in opposition to third-party defendants' motion to dismiss for lack of personal jurisdiction. Third-party defendants Walker and Mann have each submitted declarations in support of their motion to dismiss. On May 1, 1996, the court held an oral argument on the parties' motions. The following facts are drawn from the oral argument, the parties' briefs, the Curtis and Connuck affidavits, the Walker, Mann, and Ledrew declarations, plaintiffs' amended complaint, defendants' second amended answer, counterclaims, and third-party complaint, and plaintiffs' answer to defendants' counterclaims.

### A. What Is the Basis of Plaintiffs' Claims?

An understanding of the plaintiffs' claims requires a brief lesson on Russian history. Around 1860, Piotr Arsenyevitch Smirnov ("P.A. Smirnov") founded a trade house called "P.A. Smirnov in Moscow" that distilled and sold vodka and other spirits. P.A. Smirnov's vodka won a number of prestigious awards in Russia and internationally, which ultimately resulted in P.A. Smirnov receiving the title of the "Official Purveyor to the Russian Court." In 1894, P.A. Smirnov reorganized his trade house into a partnership entitled "P.A. Smirnov's Partnership of Distillery, Russian & Foreign Wine Cellars and Spirits" (the "Partnership"). It appears that the partnership included the elder three of

P.A. Smirnov's five sons, Piotr, Nikolai, and Vladimir, and P.A. Smirnov's cousin, Nikolai Venediktovich Smirnov. It is not clear whether P.A. Smirnov's two youngest sons, Sergei and Alexey, ever held or retained any interest in the Partnership.

In 1898, P.A. Smirnov died. The events that occurred after his death form the basis of this dispute. By plaintiffs' account, Vladimir and Nikolai divested themselves of their interest in the partnership, leaving Piotr to run the business. By defendants' account, Vladimir retained an interest in the Partnership. The parties do not dispute that Piotr died in 1910 and left his share of the business to his wife, Eugenia Ilnichna Smirnova. In 1914, Russia declared prohibition, and the business of the Partnership declined. By 1918, Russia had nationalized all facilities for the production of alcoholic beverages, and the Partnership ceased to operate. Eugenia subsequently married an Italian citizen and settled in Nice, France. It is not clear whether she subsequently used the Smirnov name in connection with the sale of vodka or other alcoholic beverages.

Vladimir fled to Constantinople where he established a vodka distillery under the name "Supplier to the Imperial Russian Court, Pierre Smirnoff Sons." On January 10, 1920, Vladimir obtained a certificate from the Russian Diplomatic Mission in Constantinople proclaiming him the proprietor of the "the former Supplier to the Imperial Court, Piotre Smirnoff, located in the city of Constantinople." Around 1924, Vladimir moved to Poland and established a partnership dedicated to the manufacture and sale of alcoholic beverages under the name "Pierre SmirnoffFls." Pierre SmirnoffFls opened offices in Paris, France, and Prague, in the former country of Czechoslovakia. Vladimir subsequently moved to Paris and then Nice, where Eugenia was living.

On August 21, 1933, Pierre Smirnoff Fls entered into a written agreement with Rudolph Kunett, formerly known as Rudolph Kukhesh, an American businessman and Russian emigre. In consideration for 54,000 *francs,* Pierre SmirnoffFls disclosed the recipes for its alcoholic beverages and granted Kunett the entire, exclusive, and irrevocable right to the name, business, trademarks, and goodwill of "Smirnoff" in North America. Kunett assigned his rights to himself and Messrs. Benjamin B. McAlpin, Jr., Donald M. McAlpin, and Townsend M. McAlpin. These individuals assigned their rights to Ste Pierre Smirnoff Fls, Inc., a New York Corporation. About March of 1934, Ste Pierre SmirnoffFls, Inc. commenced production and sales of vodka in the United States.

Ste Pierre Smirnoff Fls, Inc. soon applied for and received a number of United States trademark registrations based on the Smirnoff name and insignia used in connection with the sale of vodka. Ste Pierre Smirnoff Fls, Inc. thereafter sold its rights to Ste Pierre Smirnoff Fls, Incorporated, a Connecticut corporation formed by G.F. Heublein & Bro. On or about November 30, 1954, Ste Pierre SmirnoffFls, Incorporated assigned all of its rights to G.F. Heublein & Bro. In 1955, G.F. Heublein & Bro. changed its name to Heublein, Inc. Since that time, Heublein has become, through extensive advertising and promotion, a leading seller of vodka and other distilled spirits in the United States and internationally. In fact, Heublein has averaged approximately $300 million a year in vodka sales over the past decade. Delaware accounts for one-third of 1% of those sales, which amounts to approximately $1 million a year. Heublein has 6 sales representatives responsible for Delaware and 2 distributors in Delaware.

The Society, which was formed in the wake of *perestroika,*[1] is owned by two purported descendants of Sergei and Alexey Smirnov, Andrei and Boris Smirnoff.[2] Andrei and Boris are seeking to use the Smirnov name for use in connection with the manufacture and sale of vodka internationally and to prevent Heublein from doing the same. The Society appears to have had considerable success in Russia. On September 5, 1995, the Russian

---

**1.** *Perestroika* refers to former Soviet Union leader Mikhail Gorbachev's program of democratic and capitalistic reform.

**2.** There appears to be a dispute between the parties as to whether "Smirnoff" and "Smirnov" are translations of the same name from the Russian Cyrillic alphabet.

Patent Office Chamber of Appeals declared all of the Heublein Smirnoff® trademarks in Russia invalid. On September 11, 1995, a Russian District Court found that Heublein had engaged in unfair competition by virtue of false advertising and declared it unlawful for Heublein to do business in Russia under the Smirnoff® trademark. Finally, on October 27, 1995, the Chamber of Appeals dismissed Heublein's challenge to the Society's Smirnoff® trademark registrations in Russia. The Society has now filed this action to cancel Heublein's Smirnoff® trademarks in the United States.

### B. What Are the Bases of Defendants' Counterclaims and Heublein's Third-Party Complaint Against Third-Party Defendants Walker and Mann?

Defendants allege that plaintiffs and third-party defendants are publicly defaming and disparaging Heublein by claiming, among other things, that Heublein "has brazenly promoted the misleading fiction that its product is real Smirnoff vodka." RASCO issued a letter (the "bid letter"), signed by third-party defendant Walker, seeking American spirits manufacturers to bid for the right to enter into an agreement with the Society to manufacture and sell vodka in Russia under the name of Smirnoff. The bid letter details much of the history set out above from the plaintiffs' perspective, and it recounts the Society's recent Russian legal victories with respect to the Smirnoff® marks. In addition to issuing this bid letter, third-party defendant Mann, on behalf of RASCO, issued a press release apparently authored by Walker as president of RASCO. The press release discusses the filing of this suit and relates a shortened discussion similar to that contained in the bid letter.

Defendants allege that the contents of the bid letter and the press release have been published nationally. In support of this allegation, defendants have attached to their third-party complaint a January 15, 1996 article published in *Business Week* magazine entitled "Who owns the Smirnoff Name?" In addition, defendants allege that third-party defendant Mann sent the press release to A. Raymond Tye, Heublein's Massachussett's distributor, and Shelly Margolis, Heublein's exclusive Pennsylvania broker. Defendants state that these "misrepresentations ... paint an unsavory picture of Heublein as a company wilfully engaged in unlawful, fraudulent and unethical business practices," thereby damaging Heublein's goodwill and business reputation. Therefore, defendants seek to enjoin plaintiffs and third-party defendants from continuing to claim rights to the Smirnoff® marks.

### C. What are Walker's and Mann's Contacts with Delaware?

#### 1. Third-party defendant William N. Walker

According to his declaration, William N. Walker has been the president of RASCO since 1995. Walker is a domiciliary of New York, where he has been living for approximately 19 years. He does not own property in Delaware, he does not maintain an office in Delaware, he has never been to Delaware for any business purpose, and he has never solicited business in Delaware in his individual capacity. He has no agents, employees, or representatives in Delaware, and he has never acted as a surety for anyone in Delaware. Finally, he has never stayed overnight in Delaware, and in the past five years he has only driven through the state once on a trip to neighboring states.

Walker states that, as president of RASCO, he sent the press release from RASCO's office in Connecticut to journalists in New York and London. He also acknowledges that he sent the bid letter to liquor distributors in the United States, but he states that none of the addressees are in Delaware.

According to Connuck's affidavit, Walker caused this action to be filed in Delaware and has "direct control over the media and public relations activities that disparaged Heublein and gave rise to its third-party claims." In support of this statement, Connuck has attached an agreement between the Society, Boris and Andrei Smirnoff individually, RASCO, and Walker individually. The agreement authorizes RASCO, called the "Firm" in the agreement, to initiate "legal proceedings against Heublein in Federal District Court in the USA" in the name of the Soci-

ety. Under a section of the agreement entitled "Organization," the agreement states that Walker is designated as the "Manager" and as such has the authority and responsibility "[t]o determine and direct the strategy and tactics for conducting all litigation" and "[t]o direct the day-to-day action of the ... counsel in the US litigation."

Connuck alleges that the agreement also requires Walker "[to direct] the actions of the Parties in communicating with the press or media." Unfortunately, the copy of the agreement attached to his affidavit is illegible with respect to the words in brackets, "to direct." It appears that these words were redacted. Furthermore, the section entitled "Responsibilities of the Firm and Walker" has been redacted. Connuck states in his affidavit that the agreement was received by defendants from Walker in its redacted form.

**2. Third-party defendant Jerome S. Mann**

According to his declaration, Jerome S. Mann has been a liquor industry consultant for RASCO since 1995. Mann is a retired executive of the Seagram Company, Limited. He is a domiciliary of Connecticut, where he has been living for approximately 13 years. He does not own property in Delaware, and he does not maintain an office in Delaware. He has never transacted any business or contracted to supply services in Delaware on behalf of RASCO or in his individual capacity, and he has never been in Delaware for any business purpose or solicited any business in Delaware in his individual capacity. He has no agents, employees, or representatives in Delaware, and he has never acted as a surety for anyone in Delaware. He has never stayed overnight in Delaware, and in the past five years he has only driven through the state three times on pleasure trips to Baltimore, Maryland.

Mann states that he sent by facsimile the press release and a copy of a September 22, 1995 *Financial Times* article to a list of liquor distributors, including Tye in Massachusetts and Margolis in Pennsylvania. He states that he sent these documents from his home office in Connecticut. In addition, Mann states that he sent by facsimile a copy of the *Business Week* article to the same list of liquor distributors. He also sent this document from his home office in Connecticut. Defendants have not submitted any affidavits with respect to Mann or his contacts with Delaware.

## II. DISCUSSION

### A. Should the Court Transfer This Case to the District of Connecticut?

A court may transfer an action pursuant to 28 U.S.C. § 1404(a) if two conditions are met: 1) the plaintiff could have brought the case initially in the proposed transferee forum; and 2) the transfer would promote the convenience of the parties and witnesses and would be in the interest of justice. *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 878–880 (3d Cir.1995); *Shutte v. Armco Steel Corp.*, 431 F.2d 22, 24–25 (3d Cir.1970), *cert. denied*, 401 U.S. 910, 91 S.Ct. 871, 27 L.Ed.2d 808 (1971). The defendant has the burden of proof to demonstrate that these factors militate in favor of a transfer. *Shutte*, 431 F.2d at 25. Unless the balance is *strongly* in favor of a transfer, plaintiffs' choice of forum should prevail. *Id.*

The parties do not dispute that plaintiffs could have brought this action in the District of Connecticut. A "substantial part of the events underlying this litigation," in particular the marketing and sales of Smirnoff® vodka by defendants and their purchase of the rights to use the Smirnoff® mark, occurred in Connecticut. *See* 28 U.S.C. § 1391(b). The parties do dispute whether plaintiffs' choice of forum is entitled to deference, however. In addition, they dispute whether the balance of conveniences and the interest of justice favor a transfer to the District of Connecticut.

### 1. What deference is due to plaintiffs' choice of forum?

A plaintiff's choice of forum is a paramount consideration in any determination of a transfer request, and the court should not disturb the plaintiff's choice lightly. *Shutte*, 431 F.2d at 25; *Burroughs Wellcome Co. v. Giant Food, Inc.*, 392 F.Supp. 761, 763 (D.Del.1975). Deference is especially due when the plaintiff's choice of forum "relates to its legitimate, rational concerns." *Waste Distillation Technology, Inc. v. Pan*

*American Resources, Inc.,* 775 F.Supp. 759, 764 (D.Del.1991); *see also Clopay Corp. v. Newell Cos.,* 527 F.Supp. 733, 736 (D.Del. 1981). This is true even when one or all of the plaintiffs is not a resident of the forum. *See In re ML–Lee Acquisition Fund II, L.P.,* 816 F.Supp. 973, 976 (D.Del.1993); *Motown Record Corp. v. Mary Jane Girls, Inc.,* 660 F.Supp. 174, 175 (S.D.N.Y.1987) ("Even when the plaintiff is not a resident of the chosen forum, his choice is still entitled to significant weight.").

Defendants nevertheless argue that the court should not defer to plaintiffs' choice of forum because Delaware is not plaintiffs' "home turf." *See, e.g., Chrysler Capital Corp. v. Woehling,* 663 F.Supp. 478, 482 (D.Del.1987). In addition, defendants argue that Delaware has an insufficient connection to this litigation. Plaintiffs argue that even if Delaware is not their "home turf," they rationally chose Delaware as a forum in which to litigate their claims against defendants. Furthermore, plaintiffs argue that Delaware has a significant connection to this litigation.

### a. The "home turf" rule

In deciding motions to transfer pursuant to 28 U.S.C. § 1404(a), this court has developed a concept known as the "home turf" rule. The "home turf" rule states that if Delaware is the plaintiff's "home turf," the presumption in favor of the plaintiff's choice of Delaware as forum is especially strong. *See, e.g., Kirschner Bros. Oil, Inc. v. Pannill,* 697 F.Supp. 804, 806 (D.Del.1988). As originally formulated, a plaintiff's "home turf" was its home or principal place of business. *See, e.g., General Instrument Corp. v. Mostek Corp.,* 417 F.Supp. 821, 822–23 (D.Del. 1976); *Burroughs Wellcome Co. v. Giant Food, Inc.,* 392 F.Supp. 761, 763 (D.Del. 1975). Over the course of time, the court has broadened the geographical scope of the concept. "Home turf" now refers to the forum closest to the plaintiff's residence or principal place of business in which the party can effect personal service over the principal defendant. *See, e.g., Kollmorgen Corp. v. Gettys Corp.,* 760 F.Supp. 65, 67 (D.Del.1991).

The assumption underlying the "home turf" rule is that a plaintiff's "home turf" is a convenient forum for the plaintiff and its witnesses. Naturally, this assumption has lead the court to develop a negative corollary to the rule as well. If Delaware is not the plaintiff's "home turf," a plaintiff's choice of Delaware as a forum is not entitled to as much deference. *See, e.g., Burstein v. Applied Extrusion Technologies, Inc.,* 829 F.Supp. 106, 110 (D.Del.1992); *Magee v. Essex–Tec Corp.,* 704 F.Supp. 543, 547 (D.Del. 1988). This negative corollary derives from the assumption that a plaintiff choosing a distant forum must be doing so for an illegitimate reason, such as increasing the inconvenience of the forum to the defendant and its witnesses.

Like all assumptions, those underlying the "home turf" rule are merely intellectual guideposts useful for rational and consistent decision making. Litigants have sought to turn these assumptions into irrebuttable presumptions, however. On the one hand, plaintiffs argue that filing on their "home turf" precludes the court from transferring the case to another forum. On the other hand, defendants argue that the court must transfer the case when the plaintiff is not litigating on its "home turf." At the very least, defendants argue that they bear a lesser burden of proving that the convenience of the parties and the interest of justice favor a transfer. In other words, both plaintiffs and defendants have sought to turn the "home turf" rule into a proxy for the entire analysis of whether a transfer is appropriate pursuant to § 1404(a). The use of the "home turf" rule in this manner is not only undesirable but also inconsistent with the precedent of this court and the Court of Appeals for the Third Circuit.

A plaintiff may have legitimate, rational reasons for choosing a forum other than its "home turf." For example, Delaware may be closer to the area where the claims arose, to sources of proof, or to potential witnesses than either parties' "home turf." *See Critikon, Inc. v. Becton Dickinson Vascular Access,* 821 F.Supp. 962, 966 (D.Del.1993). In addition, a plaintiff may choose Delaware because it is relatively convenient for the defendant but more neutral than the forum containing the defendant's residence or prin-

cipal place of business. Finally, a plaintiff may choose Delaware based on the court's light docket and relatively quick case disposition time. In all of these instances, the plaintiff may not have chosen its "home turf" as a forum, but the plaintiff's choice nevertheless is legitimate and rational and thus entitled to deference. *See Waste Distillation,* 775 F.Supp. at 764; *Clopay,* 527 F.Supp. at 736.

█ Even if a plaintiff does not have legitimate, rational reasons for filing in Delaware, the defendant is not automatically entitled to a transfer. Moreover, the defendant's burden of proof that a transfer is appropriate does not change merely because the plaintiff lacks legitimate, rational reasons for filing in Delaware. The defendant still must prove that the convenience of the parties and witnesses and the interest of justice strongly favor a transfer. *Shutte,* 431 F.2d at 25; *see also Whitney v. Dresser,* 200 U.S. 532, 534–35, 26 S.Ct. 316, 317, 50 L.Ed. 584 (1906) (Holmes, J.) (observing that "a burden of proof ... does not change, whatever the state of evidence"). Obviously, if a plaintiff's choice of forum is not related to its legitimate, rational concerns, it will probably be easier for the defendant to meet its burden of proof that a transfer is appropriate. *See Burstein,* 829 F.Supp. at 110; *Magee,* 704 F.Supp. at 547; *General Instrument,* 417 F.Supp. at 822. The defendant still must show, however, that the overall balance strongly favors a transfer. *Shutte,* 431 F.2d at 25.

█ In summary, the "home turf" rule does not create irrebuttable presumptions for or against a transfer pursuant to § 1404(a), and it does not alter a defendant's burden of proof to show that such a transfer is warranted. The fact that Delaware is or is not the plaintiff's "home turf" is merely one factor to consider in determining the amount of deference due to the plaintiff's choice of Delaware as a forum. As long as the plaintiff's choice of forum relates to its legitimate, rational concerns, its choice "should be accorded significant weight." *Waste Distillation,* 775 F.Supp. at 764; *Bergman v. Brainin,* 512 F.Supp. 972, 973 (D.Del.1981).

### b. *What are plaintiffs' reasons for choosing Delaware as a forum?*

Although plaintiffs acknowledge that Delaware is not their "home turf," they cite a number of reasons why they have chosen Delaware as a forum. First, RASCO is a Delaware corporation that has availed itself of the benefits and consequences of Delaware law. In other words, if it can be sued in Delaware, it should be able to sue others in Delaware. Second, plaintiffs' claims are related to this forum because defendants' alleged false and deceptive practices have misled Delaware consumers. Third, the District of Delaware has a less congested docket and a faster case disposition time than other districts, including the District of Connecticut.

█ RASCO's mere status as a plaintiff Delaware corporation is not entitled to great weight in determining whether to grant a motion to transfer, especially because RASCO's principal place of business is elsewhere. *See Koster v. Lumbermens Mutual Casualty Co.,* 330 U.S. 518, 527–28, 67 S.Ct. 828, 833–34, 91 L.Ed. 1067 (1947); *Brownell v. La Salle Steel Co.,* 128 F.Supp. 548, 549 (D.Del. 1955); *but see Critikon,* 821 F.Supp. at 965 (stating that a defendant Delaware corporation cannot complain if it is sued in Delaware). It is legitimate and rational, however, for a plaintiff to choose to litigate in a forum in which it is incorporated. Moreover, it is legitimate and rational for a plaintiff to choose a forum in which consumers in the forum allegedly are being injured by the defendant's activities. Finally, it is legitimate and rational for a plaintiff to choose between forums based on the relative congestion of the dockets. The court will discuss this factor in greater detail during its discussion of the interest of justice factors relating to whether a transfer is appropriate.

█ Defendants appear to argue in their reply brief in support of their motion to transfer that even if injury to consumers in Delaware is a legitimate reason for filing this action in Delaware in the abstract, plaintiffs' claims have so little connection to Delaware that venue in this court is improper. If this were true, and if defendants had made a

"timely and sufficient objection to the venue," 28 U.S.C. § 1406 would have required the court to dismiss this case or transfer it to a district in which it could have been brought initially. Defendants failed to raise a venue objection in their answer or motion to transfer, however. Thus, defendants have waived the defense of improper venue. FRCP 12(b)(3) & 12(h); *See Myers v. American Dental Ass'n,* 695 F.2d 716, 719–20 (3d Cir. 1982), *cert. denied,* 462 U.S. 1106, 103 S.Ct. 2453, 77 L.Ed.2d 1333 (1983).

Apparently aware of this waiver, defendants seek to argue that improper venue nevertheless should be considered in deciding whether "to warrant deference to plaintiff's choice of forum within the context of this motion pursuant to 28 U.S.C. § 1404(a)." Defendants do not cite, nor is the court able to find, any authority for this proposition. The court need not reach this issue, however, because it finds that venue is proper in Delaware.

Claims under the Lanham Act arise not where an allegedly deceptive label is affixed to the defendant's product but where a customer buys the product. *Cottman Transmission Systems, Inc. v. Martino,* 36 F.3d 291, 295 (3d Cir.1994); *Tefal, S.A. v. Products Int'l Co.,* 529 F.2d 495, 496 n. 1 (3d Cir.1976). Thus, venue is proper in this district if a "substantial part" of the defendant's sales and marketing of its allegedly misleading product occurred in Delaware. 28 U.S.C. § 1391(b). One way to measure whether a "substantial part" of the defendant's sales have occurred in Delaware is to examine the percentage of national sales of the products in the state. *Tefal,* 529 F.2d at 496. Because Delaware is a relatively small state, however, a percentage may understate the effect of misleading products on Delaware consumers. Thus, it is appropriate to look at other factors such as revenue from Delaware, the number of products sold into Delaware, and the use of sales agents in Delaware. *See id.* (observing the relevance of sales agents to whether venue is appropriate); 4 J. Thomas McCarthy, *Trademarks and Unfair Competition* § 32.22[5] at 32:90.1–32.91 (4th ed. 1995).

In this case, defendants have stated in their opening brief that Heublein's sales into Delaware of the allegedly misleading product, Smirnoff® vodka, amount to only one-third of 1% of Heublein's national sales. In their counterclaims, however, defendants state that annual sales of Smirnoff® vodka have totaled $300 million during each of the past ten years. This means that defendants have sold $1 million worth of Smirnoff® vodka into Delaware during each of the past 10 years. Furthermore, defendants have 2 distributors in Delaware and 6 sales representatives that serve Delaware. These facts more than support the conclusion that a "substantial part" of defendants' sales and marketing of Smirnoff® vodka have occurred in Delaware.

Because plaintiffs' have identified three legitimate and rational reasons for choosing Delaware as a forum—RASCO's status as a Delaware corporation, the relative lack of congestion on this court's docket, and the potential injury to Delaware consumers—and because Delaware is an appropriate venue in which to bring this action, plaintiffs' choice of forum "should be accorded significant weight." *Waste Distillation,* 775 F.Supp. at 764; *Bergman,* 512 F.Supp. at 973.

2. *Would transfer serve the convenience of the parties and witnesses?*

Defendants assert that the District of Connecticut is more convenient for the parties and defendants' witnesses for a number of reasons. First, Heublein's and RASCO's principal places of business are in Connecticut. Second, current and former employees who are Heublein's likely witnesses all reside in Connecticut. Third, all of Heublein's relevant documents are in Connecticut. Fourth, the prolonged absence of key management personnel will disrupt Heublein's business. Fifth, third-party defendants Walker and Mann reside in Connecticut. Sixth, any witnesses for the Society will travel the same distance from Russia to Delaware or Connecticut.

As this court has observed, technological advances have made it more difficult for defendants to establish that litigating in Dela-

ware is inconvenient for the parties and the witnesses. *Tuff Torq Corp. v. Hydro–Gear Ltd. Partnership,* ·882· F.Supp. 359, 363 (D.Del.1994). This is especially true when the defendants are substantial companies doing business in the national market place. *Wesley–Jessen Corp. v. Pilkington Visioncare, Inc.,* 157 F.R.D. 215, 218 (D.Del.1993). Thus, defendants must establish that litigating this case in Delaware will pose a "unique or unusual burden" on their business operations. *Id.*

The mere fact that many or all of a defendant's witnesses and corporate documents reside in the transferee forum does not by itself justify a transfer. *See, e.g., USLIFE Corp. v. American Republic Ins. Co.,* 218 U.S.P.Q. 298, 1982 WL 52201 (D.D.C.1982); *Chicago Reader, Inc. v. Metro College Publishing, Inc.,* 495 F.Supp. 441 (N.D.Ill.1980). Heublein has not sufficiently proven that a trial in Delaware will result in a "prolonged absence" of its witnesses or documents from Connecticut. *See Burstein,* 829 F.Supp. at 112. Moreover, Heublein has not shown that all of its listed witnesses will in fact give or even possess helpful testimony, particularly concerning the transactions underlying this lawsuit that occurred between 50 and 100 years ago. Finally, defendants have not shown how the·absence of largely historical documents and a small number of employees will significantly disrupt the operations of a company with 500 employees in its Connecticut offices. *Cf. Magee,* 704 F.Supp. at 549 (granting a transfer from Delaware to California because of the hardship posed to the defendant, a small California company. with only 25 employees). Thus, these arguments fail to establish that the convenience of the parties or the witnesses strongly favors a transfer to the ·District of Connecticut.

Defendants' remaining arguments likewise fail. With respect to the location of third-party defendants Walker and Mann, the court is dismissing the claims against them for the reasons set out below in the court's discussion of why it cannot exercise personal jurisdiction over these individuals. Thus, their residence is irrelevant to a transfer determination. Undeterred by this possibili-

ty, defendants argue in the alternative that because the District of Connecticut undoubtedly would have personal jurisdiction over Walker and Mann, the lack of jurisdiction over these individuals actually favors a transfer. Defendants·should not be able to file a· third-party complaint against individuals over whom this court clearly cannot exercise personal jurisdiction and then use that lack of authority as a basis for a motion to transfer pursuant to § 1404(a).

With respect to the location of the Society and its documents and witnesses, and for that matter the location of defendant IDV and its documents and witnesses, defendants correctly observe that from a geographical point of view it makes little difference to these foreign corporations whether they litigate in Delaware or Connecticut. The court disagrees, however, that such neutrality favors a transfer, especially when a foreign plaintiff has chosen Delaware as a forum for legitimate, rational reasons unrelated to geography. *Compare Hall v. Kittay,* 396 F.Supp. 261, 263 (D.Del.1975); *Quandt v. Beech Aircraft Corp.,* 317 F.Supp. 1009 (D.Del.1970). Thus, defendants have not shown that the balance of conveniences to the parties and the witnesses strongly favors a transfer. *See Shutte,* 431 F.2d at 25.

3. *Is a transfer in the interest of justice?*

The parties have offered argument and· evidence on each of the following factors relevant to whether a transfer is in the interest of justice: 1) the access to sources of proof; 2) the availability ·of compulsory process for third-party witnesses; 3) the relative congestion of the dockets; 4) the cost to the parties; and 5) the local interest in the controversy. *Waste Distillation,* 775 F.Supp. at 767; *Magee,* 704 F.Supp. at 549; *see also Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508–09, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947) (discussing factors relevant to dismissing a case under the doctrine of *forum non conveniens*).

a. *The access to sources of proof*

The parties' relative ease of access to sources of proof is one factor to consider in determining whether a transfer is appropriate. *Waste Distillation,* 775

F.Supp. at 767; *Critikon,* 821 F.Supp. at 966. Undoubtedly the District of Connecticut is closer than the District of Delaware to many of Heublein's and RASCO's officers, witnesses, and documents. Many of the parties' relevant documents are also located in New York, however, which is roughly equidistant to Connecticut and Delaware. Moreover, neither district is closer to IDV's or the Society's officers, witnesses, and documents. Finally, as set out above, defendants are national companies, and the state of technology greatly reduces the burden placed on parties with respect to the storage, production, transfer, and exchange of information. *See Wesley–Jessen,* 157 F.R.D. at 218. Thus, this factor does not weigh strongly in favor of a transfer.

b. *The availability of compulsory process for third-party witnesses*

The availability of compulsory process for third-party witnesses is another factor to consider in determining whether a transfer is warranted. *Magee,* 704 F.Supp. at 550; *Brownell,* 128 F.Supp. at 550. Defendants are correct that none of the Connecticut witnesses currently listed by them are subject to the 100–mile subpoena power of this court. *See* FRCP 45(e). Plaintiffs argue in response that witnesses to public confusion with respect to the Smirnoff® mark are located in Delaware and in surrounding states within the subpoena power of the court. Because defendants serve a national market, however, consumer witnesses are available in any district, including Connecticut. Thus, this factor leans in favor of a transfer.

c. *The relative congestion of the dockets*

The relative congestion of the court's docket to that of the transferee forum is relevant in determining whether to transfer a case pursuant to § 1404(a). *See Jumara,* 55 F.3d at 879, 883; *Solomon v. Continental American Life Ins. Co.,* 472 F.2d 1043, 1047 (3d Cir.1973) (stating that it is proper to consider the relative number of pending cases per judge and citing statistics from the Administrative Office of the United States Courts, *Management Statistics for the*

*United States Courts* (November 1972)); *Olinick & Sons v. Dempster Bros., Inc.,* 365 F.2d 439 (2d 1966) (stating that it is proper to consider the relative length of time from the filing of the action to trial); *Waste Distillation,* 775 F.Supp. at 767; *Hall,* 396 F.Supp. at 264–65; *General Electric Co. v. Westinghouse Electric Corp.,* 294 F.Supp. 36, 37 (D.Del.1968); 1A Pt. 2 James W. Moore & Brett A. Ringle, *Federal Practice* ¶ 0.345[5] at 4373 (2d ed. 1995); 15 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3854 (2d ed. 1986) (hereinafter "Wright et al."); *see also Gulf Oil,* 330 U.S. at 508–09, 67 S.Ct. at 843 (stating that docket congestion is relevant to a *forum non conveniens* determination).

Many plaintiffs are drawn to the District of Delaware because of its lighter docket and faster case disposition time. The Society and RASCO specifically relied on these factors in choosing Delaware as the forum in which to litigate their claims. They have cited statistics showing that during the 12-month period ending March 31, 1994, the median length of time from the filing of a civil action to trial in the District of Delaware was 17 months, whereas the comparable period for the District of Connecticut was 30 months. *See* Administrative Office of the United States Courts, *Federal Judicial Caseload Statistics* (March 1994).

The court has also consulted more recent statistical tables compiled by the Administrative Office of the United States Courts. During the 12–month period ending December 31, 1995, the median length of time from the filing of an action to trial in the District of Connecticut was 40 months, whereas the comparable length of time for the District of Delaware was 18 months. *See* Administrative Office of the United States Courts, *Statistical Tables for the Federal Judiciary* 39 (December 31, 1995). On December 31, 1995, the District of Connecticut had 4,010 civil cases and 169 criminal cases pending with 8 active district judges. *Id.* at 21, 42. At that same time, the District of Delaware had 775 civil cases and 43 criminal cases pending with 4 active district judges. *Id.* Thus, the District of Connecticut had 522.375 cases pending per active judge, whereas the

District of Delaware had only 204.5 cases pending per active judge. These are considerable differences in case disposition time and docket congestion that militate against transfer of this case to the District of Connecticut.

### d. The cost to the parties

■ The relative cost to the parties is another consideration relevant to whether transfer is appropriate. *Burstein,* 829 F.Supp. at 113; *Magee,* 704 F.Supp. at 549. Heublein asserts that its costs would be less if allowed to litigate this action in Connecticut rather than Delaware. It does not appear that either IDV's, RASCO's, or the Society's costs are likely to change if the case is transferred, however. Moreover, given the relative congestion of the dockets, a transfer to the District of Connecticut may actually deplete more of the parties' assets in the long run. *See Waste Distillation,* 775 F.Supp. at 767. Thus, this factor does not strongly favor transfer.

### e. The local interest in the controversy

■ Plaintiffs properly point out that Delaware has an interest in this controversy as it involves alleged consumer deception based on millions of dollars of sales of Smirnoff® vodka into Delaware over the last decade. Defendants argue that Connecticut has a similar interest in preventing the deception of its own consumers. They also argue that the interest of justice is served having a controversy between two parties with their principal places of business in Connecticut decided "at home." The court observes, however, that Heublein has been incorporated in Connecticut for over 40 years, whereas RASCO incorporated in Connecticut only recently. As a result, RASCO may not feel like Connecticut is its "home" in the sense that it probably has not built a sense of good will with the community as Heublein probably has. In fact, RASCO and the Society may have filed in Delaware in part to avoid any potential bias against themselves in Connecticut because of such good will.

The court further observes that many of the issues underlying this litigation cannot properly be characterized as "local" to the District of Connecticut or the District of Delaware. Most of the facts in dispute involve transactions that occurred in Russia, Poland, France, and New York. Moreover, the controversy is primarily between a Russian family that was divested of its commercial success by the Bolshevik revolution and an American company that has spent millions of dollars to build an international reputation for its products. Therefore, this factor does not favor a transfer.

■ Weighing the factors set out above, the court finds that defendants have not shown that the interest of justice strongly favors a transfer of this case to the District of Connecticut. *See Shutte,* 431 F.2d at 25. The small savings in cost, the slightly greater access to sources of proof, and the availability of compulsory process do not substantially outweigh plaintiffs' legitimate reasons for filing in Delaware, particularly with respect to the faster case disposition time and lesser docket congestion found in the District of Delaware. Therefore, the court will defer to plaintiffs' choice of forum and deny defendants' motion to transfer pursuant to § 1404(a).

■ The court observes that defendants have referred to the doctrine of *forum non conveniens* in their briefs in support of their motion to transfer this case. The standard for a dismissal under the doctrine of *forum non conveniens* is higher than the standard for transfer under § 1404(a). *Norwood v. Kirkpatrick,* 349 U.S. 29, 75 S.Ct. 544, 99 L.Ed. 789 (1955); *Solomon,* 472 F.2d at 1046. Because the court has determined that transfer is not appropriate under § 1404(a), dismissal pursuant to *forum non conveniens* is likewise inappropriate.

### B. Can This Court Exercise Personal Jurisdiction Over Third–Party Defendants Walker and Mann?

■ In determining whether to exercise personal jurisdiction over Walker and Mann, the court must engage in a two-step analysis. First, the court must examine whether the Delaware long-arm statute, 10 Del.C. § 3104, authorizes the exercise of jurisdiction over Walker and Mann. *Max Daetwyler Corp. v. Meyer,* 762 F.2d 290, 293 (3d Cir.), *cert.*

*denied,* 474 U.S. 980, 106 S.Ct. 383, 88 L.Ed.2d 336 (1985); *Jeffreys v. Exten,* 784 F.Supp. 146, 150 (D.Del.1992); FRCP 4(e). If the long-arm statute authorizes exercising jurisdiction, then the court must decide whether exercising jurisdiction comports with the requirements of the Due Process Clause. *Id.*

1. *What burden does a party face when an opposing party has filed a motion to dismiss pursuant to FRCP 12(b)(2)?*

■ A party need not plead facts in support of this court's exercise of personal jurisdiction over an opposing party. *Stirling Homex Corp. v. Homasote Co.,* 437 F.2d 87, 88 (2d Cir.1971) (*per curiam*); *Hansen v. Neumueller GmbH,* 163 F.R.D. 471, 474 (D.Del.1995). Once the opposing party challenges the exercise of personal jurisdiction by filing a motion to dismiss pursuant to FRCP 12(b)(2), however, the nonmoving party bears the burden of establishing that this court properly may exercise personal jurisdiction over the moving party. *Carteret Savings Bank, FA v. Shushan,* 954 F.2d 141, 146 (3d Cir.), *cert. denied,* 506 U.S. 817, 113 S.Ct. 61, 121 L.Ed.2d 29 (1992); *Mobil Oil Corp. v. Advanced Environmental Recycling Technologies, Inc.,* 833 F.Supp. 437, 440 (D.Del. 1993).

■ If the court elects not to hold a pre-trial evidentiary hearing on the issue of personal jurisdiction, the nonmoving party may meet its burden by presenting a *prima facie* case in support of the exercise of personal jurisdiction over the moving party. *Mellon Bank (East) PSFS, Nat'l Ass'n v. Farino,* 960 F.2d 1217, 1223 (3d Cir.1992). The nonmoving party presents a *prima facie* case by "establishing with reasonable particularity sufficient contacts" between the moving party and Delaware to satisfy Delaware's long-arm statute and the Due Process Clause of the United States Constitution. *Mellon Bank,* 960 F.2d at 1223; *see also Boit v. Gar–Tec Prods., Inc.,* 967 F.2d 671, 675 (1st Cir.1992). Whether the nonmoving party has presented a sufficient *prima facie* case depends primarily on the stage of the litigation.

■ Prior to the beginning of discovery, the nonmoving party may rely on the good faith factual allegations of its complaint, cross claims, or counterclaims if such allegations establish sufficient contacts between the moving party and Delaware. *Ball v. Metallurgie Hoboken–Overpelt, S.A.,* 902 F.2d 194 (2d Cir.), *cert. denied,* 498 U.S. 854, 111 S.Ct. 150, 112 L.Ed.2d 116 (1990); *Sears, Roebuck & Co. v. Sears, plc,* 744 F.Supp. 1297, 1301 (D.Del.1990); F.R.C.P. 11(b); *see also Renner v. Lanard Toys Ltd.,* 33 F.3d 277 (3d Cir.1994) (holding that a district court should defer granting a motion to dismiss pursuant to FRCP 12(b)(2) until the plaintiff has had a sufficient opportunity to conduct discovery). Of course, the court need not allow discovery when the allegations of personal jurisdiction are clearly frivolous. *Compagnie Des Bauxites de Guinee v. L'Union Atlantique S.A. d'Assurances,* 723 F.2d 357, 362 (3d Cir.1983). Moreover, the nonmoving party must be diligent in seeking discovery once a motion to dismiss has been filed. *Id.; Singletary v. B.R.X., Inc.,* 828 F.2d 1135, 1137–38 (5th Cir.1987); *Ray v. Bird and Son and Asset Realization Co.,* 519 F.2d 1081, 1082–83 (5th Cir.1975); *Whittaker Corp. v. United Aircraft Corp.,* 482 F.2d 1079, 1085–86 (1st Cir.1973).

■ After discovery has begun, the nonmoving party cannot rely on the allegations of its complaint. *See Stranahan Gear Co. v. NL Indus., Inc.,* 800 F.2d 53, 58 (3d Cir.1986); *Time Share Vacation Club v. Atlantic Resorts, Ltd.,* 735 F.2d 61, 66 n. 9 (3d Cir.1984). The nonmoving party "must sustain its burden of proof in establishing jurisdictional facts through sworn affidavits or other competent evidence." *Time Share,* 735 F.2d at 66 n. 9; *see also Boit,* 967 F.2d at 675; *Serras v. First Tennessee Bank Nat'l Ass'n,* 875 F.2d 1212, 1214 (6th Cir.1989); *Mobil Oil,* 833 F.Supp. at 440. In other words, the nonmoving party must base its *prima facie* showing of personal jurisdiction over the moving party on evidence of specific facts set out in the record. *See Boit,* 967 F.2d at 675.

■ The court must accept the nonmoving party's proffered evidence as true and it must resolve all disputed facts and

draw all reasonable inferences in the non-moving party's favor. *Boit,* 967 F.2d at 675; *Sears,* 744 F.Supp. at 1301; *see also Carteret,* 954 F.2d at 142 n. 1. If the nonmoving party succeeds in presenting a *prima facie* case based on its proffered evidence, the court may order an evidentiary hearing or deny the motion to dismiss. *Boit,* 967 F.2d at 676; *Metropolitan Life Ins. Co. v. Neaves,* 912 F.2d 1062, 1064 n. 1 (9th Cir.1990). If the court denies the motion to dismiss based on the *prima facie* standard, the moving party later may raise again the issue of the exercise of personal jurisdiction over it. *Boit,* 967 F.2d at 676; *Metropolitan Life,* 912 F.2d at 1064 n. 1; *see also* 5A Wright et al, § 1373 at 557. Eventually, the nonmoving party must establish by a preponderance of the evidence, either at a pre-trial hearing or at trial, that the exercise of personal jurisdiction over the moving party is proper. *Carteret,* 954 F.2d at 146; *Mobil Oil,* 833 F.Supp. at 440 (D.Del.1993).

The court has not held an evidentiary hearing in this case, but discovery has begun. Therefore, defendants must present a *prima facie* case in support of the exercise of personal jurisdiction over Walker and Mann by submitting sworn affidavits or other competent evidence. *Time Share,* 735 F.2d at 66 n. 9. Defendants' *prima facie* case must establish with reasonable particularity sufficient contacts between the moving party and Delaware to satisfy Delaware's long-arm statute and the Due Process Clause of the United States Constitution. *Mellon Bank,* 960 F.2d at 1223. The court must accept defendants' proffered evidence as true and it must resolve all disputed facts and draw all reasonable inferences in defendants' favor. *Sears,* 744 F.Supp. at 1301.

2. *Have defendants met their burden to show that this court can exercise personal jurisdiction over Walker and Mann?*

■ Defendants argue that § 3104(c)(3) of the Delaware long-arm statute authorizes this court to exercise personal jurisdiction over Walker and Mann. This provision states:

(c) As to a cause of action brought by any person arising from any of the acts enu-

merated in this section, a court may exercise personal jurisdiction over any nonresident, or his personal representative, who in person or through an agent:

. . . .

(3) Causes tortious injury in the State by an act or omission in this State; . . . .

10 Del.C. § 3104(c)(3). Defendants argue that Walker and Mann disseminated the allegedly defamatory statements contained in the press release and the bid letter and that these statements subsequently were published in Delaware, thereby "consummating" the tort of defamation in Delaware and causing tortious injury in Delaware. Walker and Mann argue that these acts were not committed "in Delaware" as § 3104(c)(3) requires.

■ The court agrees that Walker's and Mann's acts were not "in Delaware" as that phrase is used in § 3104(c)(3). In order for a defendant to commit an act in Delaware and be subject to subsection (c)(3) of the Delaware long-arm statute, the defendant, or an agent of the defendant, must be present in Delaware when the deed is done. *Compaq Computer Corp. v. Packard Bell Electronics, Inc.,* C.A. No. 95–222–RRM at 8–9 (D.Del. Feb. 2, 1996) (slip opinion); *Sears,* 744 F.Supp. at 1294. In *Compaq* the court held that the authorization or ratification of an allegedly defamatory letter sent to Delaware from California did not constitute an act in Delaware under the long-arm statute. *Id.* Likewise, in *Sears* the court held that the mailing of promotional materials into Delaware from outside the state did not constitute an act "in Delaware" for the purpose of § 3104(c)(3). *Id.* at 1294. Walker and Mann were in Connecticut when they disseminated the bid letters and the press release. Therefore, they did not commit an act "in Delaware" as required by the statute.

The fact that recipients of the bid letter and the press release republished the allegedly defamatory statements in Delaware does not alter this conclusion. In *Ramada Inns, Inc. v. Drinkhall,* C.A. No. 83C–AU–56, 1984 WL 247023 (Del.Super.Ct. May 17, 1984), the plaintiffs sued two writers and the publisher of the Wall Street Journal for two allegedly libelous stories that appeared in the

paper. The court held that although the publisher distributed the stories in Delaware, the individual defendants wrote the articles outside of Delaware and thus did not commit any act "in Delaware" under § 3104(c)(3). *Id.* at *3–5. The court also cited defamation cases from other jurisdictions with long-arm provisions identical to § 3104(c)(3) in which courts declined to exercise personal jurisdiction over a defendant when the allegedly defamatory statement was not made in the forum state. *Id.* Finally, the court reasoned that allowing the exercise of personal jurisdiction over a defendant merely because that defendant allegedly caused tortious injury in Delaware would eviscerate the difference between § 3104(c)(3) and § 3104(c)(4), which does not require an act in Delaware. *Id.* (citing *Moore v. Little Giant Industries,* 513 F.Supp. 1043 (D.Del.1981), *aff'd,* 681 F.2d 807 (3d Cir.1982)); *see also Compaq,* C.A. 95–222–RRM at 9–10.

The only acts alleged by defendants that Walker committed "in Delaware" are the filing of this lawsuit and the incorporation of RASCO. Defendants further allege that these acts are attributable to Mann as a co-conspirator of Walker's. The court observes that defendants have not proffered specific evidence establishing that Walker in fact authorized this lawsuit or the incorporation of RASCO in Delaware or that a conspiracy exists between Mann and Walker. Viewing Mann's activities as RASCO's consultant and the agreement between Walker and the Society in the light most favorable to defendants, however, the court will assume that these acts are attributable to Walker and to Mann as a co-conspirator.

Even making this assumption, the filing of this lawsuit and the incorporation of RASCO in Delaware do not suffice to establish this court's ability to exercise personal jurisdiction over Walker and Mann. These acts do not have a sufficient nexus with defendants' third-party complaint to support the exercise of specific jurisdiction under § 3104(c)(3). In other words, these acts have not caused the "tortious injury" that forms the basis of defendants' complaint. *Compare Mobil Oil,* 833 F.Supp. at 443–45 (holding that the exercise of jurisdiction was proper under

§ 3104(c)(3) because the third-party defendant authorized or directed the filing of a "sham" complaint in Delaware that was the basis of the third-party complaint). Thus, even when the court views all of defendants' proffered evidence in the light most favorable to them, defendants have failed to present a *prima facie* case that § 3104(c)(3) allows this court to exercise jurisdiction over Walker and Mann.

Although defendants have not demonstrated sufficient contacts to satisfy the exercise of personal jurisdiction under the specific language of § 3104(c), they nevertheless argue that the exercise of jurisdiction under the long-arm statute is proper because "courts have interpreted Delaware's long-arm statute expansively as conferring jurisdiction to the maximum parameters of the due process clause," citing *Mobil,* 833 F.Supp. at 442. As this court has stated previously, the court cannot ignore the strict language of Delaware's long-arm statute requiring that the defendant perform a tortious act "in Delaware." *Compaq,* C.A. 95–222–RRM at 13–14; *Mobil,* 833 F.Supp. at 445 (declining to exercise jurisdiction over a third-party defendant who had not committed an act in Delaware related to the defendant's third-party complaint); *see also Red Sail Easter Limited Partners v. Radio City Music Hall Productions,* C.A. No. 12036, 1991 WL 129174, at *3 (Del.Ch.Ct. July 10, 1991) (stating that in determining whether the Delaware long-arm statute applies, the "application of statutory words to the facts in hand [cannot] be slighted"); *Ramada Inns,* 1984 WL 247023, at *2 ("When qualifying language is used [in § 3104(c)], the Court should not ignore that language out of a desire to afford maximum jurisdictional coverage").

Because the Delaware long-arm statute does not authorize the exercise of jurisdiction over Walker and Mann, the court need not analyze whether exercising such jurisdiction would comport with the Due Process Clause. In addition, the court need not reach the issues of whether defendants sufficiently served process on Walker and Mann pursuant to FRCP 12(b)(5) or whether defendants' third-party complaint fails to state a claim

against Walker and Mann pursuant to FRCP 12(b)(6).

The court will issue an Order in accordance with this Opinion.